*Harlan*, for appellants ; *Morehead & Brown*, for appellee.

---

HAWKINS
*vs.*
GRIMES.

---

Hawkins *vs.* Grimes.

APPEAL FROM MADISON CIRCUIT.

WILL CASE.
Case 28.

13m257
†101  72
13bm257
111 244

Judge MARSHALL delivered the opinion of the court.  October 5.

1. In determining the question of capacity in a testator to make an alteration in his will, it is competent to use in evidence an inquisition by which the testator was found to be a lunatic some time before his death, and leave the jury to decide whether the alteration was made before or after the inquisition.

2. Upon the question whether certain alterations in a will, the body of which was admitted to be in the hand-writing of the testator, were also in his handwriting, it was competent for witnesses,

though not acquainted with the handwriting of the testator, to give their opinions whether the alterations were or were not in the handwriting of the balance of the will, and to point out variances in the form of letters, words, &c., leaving the jury to decide upon their own inspection as well as such aids. (1 *Greenleaf,* §577.)

3. Witnesses not acquainted with the handwriting of the party, cannot, where the writing appears to have been altered by erasures and interlineations, testify and give their opinion whether the whole or any part is genuine; in such case, opinion must be founded upon previous knowledge of the handwriting of the party.

4. The decisions of this court are against comparison of handwriting, even by the jury, to determine their genuineness. (See *McAllister* v. *McAllister,* 7 *B. Monroe;* see, also, 5 *Adol. & Ellis,* 703, decided in 1836 in which the English judges were equally divided.)

5. The propounder of a will holds the affirmative in the probate thereof, and must make out a *prima facie* case; when this is done, the rebutting and countervailing proof devolves upon the other party, and the jury decide upon the validity of the will from the whole proof.

6. The legal presumption is in favor of the sanity of a testator, though the statute may require some proof of sanity; and if the evidence render the question of sanity doubtful, the legal presumption should have its effect, and any instruction of the court which excludes that from the consideration of the jury, is erroneous.

A paper purporting to be the will of Charles S. Hawkins, and bearing date the 2d of July, 1840, having, in August, 1848, been admitted to probate in the Madison county court, as a will wholly written and signed by the testator, this bill was filed in the Madison circuit court, by several of the heirs against the devisees of C. S. Hawkins, to contest the validity of said paper as a will.

The issues arising upon the pleadings and evidence, are—First, whether the paper in question, to which there is no attesting witness, was wholly written and signed by the decedent himself; and second, whether, if the paper was wholly written by him, he was of sound and disposing mind and memory at the time of writing and signing it. And each of these issues arises particularly in reference to certain important words and figures alleged to have been inserted in the paper, by erasing or obliterating the words first written, and inserting other words and figures in their place. There is evidence conducing to prove that this was, in fact, the case. And the particular ques-

tions arising on this branch of the case are—first, whether the words and figures now referred to, or any of them, were, in fact, interpolated after and in the place of other words first written; second, whether they were written wholly by the supposed testator; and third, whether, if so written, he was at the time of writing them of sound and disposing memory.

The original paper which has been brought up with the record presents intrinsic evidence of its having been altered after the first writing, in the particulars referred to; but there is no direct evidence as to the time when the alteration was made, and but little ground for inference. No witness ever saw the paper until after the death of C. S. Hawkins, when it was exhibited by C. A. Hawkins, the principal devisee, at whose house the alleged testator died, and who stated that he had found it in the pocket or pocket-book of the decedent after his death.

Upon the evidence there is no serious question that the paper was signed and written by C. S. Hawkins, except with regard to the alleged interpolations, as to which the evidence is contradictory, and this court would not be authorized to disturb a verdict either way which had received the sanction of the circuit judge presiding at the trial. Nor does there seem to be any serious question as to the competency of C. S. Hawkins to make a will at the date of the paper in question, and for some years afterwards. But if there be alterations in the writing, not made and written by the testator himself, the whole will must fail; or if written by himself, the will must still fail, unless, when written, he was competent to make a will.— Whether, upon the assumption that the alterations were made by the testator himself, he was then competent, depends upon the question when the alterations were, in fact, made. For not only was there oral evidence that he was insane for some months previous to his death, but the complainants produced in evidence an inquisition of lunacy finding him to

HAWKINS
*vs.*
GRIMES.

1. In deter-
mining the
question of ca-
pacity in a tes-
tator to make
an alteration in
his will, it is
competent to
use in evidence
an inquisition
by which the
testator was
found to be a
lunatic some
time before his
death, and leave
the jury to de-
cide whether
the alteration
was made be-
fore or after the
inquisition.

have been a lunatic without lucid intervals from a period of about seventeen months prior to his death.

This evidence was objected to, but the admissibility of such inquisitions, and their effect as *prima facie* evidence, are well established. And although the inquisition was entitled to no effect upon the verdict, unless the jury should believe that the alterations, if any, made in the will were made after the period to which the inquisition refers, its admissibility before the jury did not depend upon the determination of that fact, which they alone could decide, but merely upon its own efficacy to prove the fact which it stated as to the period during which the lunacy had existed. As the inquisition fixed the period at which the lunacy found by it commenced, it was not necessary that the court should, unasked, qualify its admission by telling the jury either that it did not prove the existence of lunacy before the period named, or that it could not affect the validity of any part of the paper offered as a will, unless such part was written after that period. The time at which the alterations, if any, were made not being conclusively fixed by the testimony, and being open for the decision of the jury, the effect of admitting the inquisition without qualification, was not to pre-judge the question as to the time of the alterations, but to leave the jury free to inquire and decide whether the alterations were or were not made within the period to which the evidence of lunacy applied. We perceive no error, therefore, in admitting this evidence or in failing to qualify it.

Upon the question, whether the alleged alterations were written by C. S. Hawkins, three witnesses, Barnes, Moran, and Nolan, professing experience in the examination of writings, but who had no previous knowledge of the handwriting of C. S. Hawkins, undertook to point out discrepancies between the letters, or some of them, in the parts of the writing alleged to have been altered, and the same letters in other parts of it; also to state that from the appearance of the

paper and the writing on it, the original writing seemed to have been altered by erasure and insertion. In addition to which they expressed their opinion or belief that the words inserted were not in the same handwriting as the other parts of the paper. This testimony and every part of it was objected to by the defendant as incompetent, but the objection was over-ruled by the court. The admission of this evidence was made a ground of the motion for a new trial, and is now urged as a ground of reversal.

The general rule with respect to proof of handwriting requires that the witness shall have had personal knowledge of the party's handwriting, either by having seen him write, or by having seen writings purporting to be his and afterwards admitted by him, or with his knowledge and acquiescence acted on as his, or adopted into the ordinary transactions of life as his. (1 *Greenleaf's Ev.* §577.) The same author in §578 states the exceptions to be—First, where the writing is of such antiquity that living witnesses cannot be had, but not so old as to prove itself; in which case other documents either admitted to be genuine or proved to have been treated and acted on as such by all parties, may be produced, and experts may, upon comparison, testify their opinion concerning the genuineness of the writing in question. Second, where other writings admitted to be genuine are already in the case; in which case he says the comparison may be made by the jury without the aid of experts.

In the present case, it is to be observed that the witnesses do not undertake to say that any part of the instrument in question is or is not in the hand-writing of the decedent, from a comparison of this instrument or any part of it with other writings, which, under the rule and exceptions above stated, could not be done, except on the ground of antiquity, or where the other writings are admitted and already in the case. But they undertake, first, to speak of facts as they appear to them on the face of one and

the same instrument, which instrument the objecting party not only admits but insists is genuine, and, secondly, to express their opinion by comparison of that part of the instrument which is disputed with other parts of the same instrument, that the whole is not in the same handwriting.

There is, as we think, a clear distinction between these two branches of the testimony in question. The entire instrument being before the jury, with the question whether the whole and every part of it was written by C. S. Hawkins, upon which question, as no one saw the instrument written, evidence of handwriting furnished the only means of proof, the jury, besides hearing such evidence as was admissible on that subject, must of necessity have the right to compare the different parts of the writing and the disputed with the undisputed parts, as a means of determining whether it was wholy written by the same person. And this is allowable under the principle of the second exception to the general rule excluding comparison of hands. One element of this comparison consists in the observation of the resemblance or difference which may be found in the formation of the same letters and words in different parts of the instrument. And although a difference in this respect may in itself furnish but slight ground, and sometimes none, for inferring the non-identity of the handwriting, yet it may be resorted to, and with such effect as, under all the evidence, the jury may think it entitled to. But because the jury may make this observation themselves, and are to judge of its weight and effect upon the principal question, it does not follow that they must be unaided in the scrutiny, or that they should only be aided by the evidence of those who have a previous acquaintance with the handwriting of the individual.

Where the discrepancies are glaring, a jury might observe them without aid from others. But such as are more minute and less striking would not, unless pointed out, be noticed by ordinary persons or wit-

nesses, while they might be easily discernible by persons experienced in the examination of writings, whether acquainted with the handwriting of the individual or not.  The pointing out of such discrepancies in the shape, size, inclination, or shading of particular letters or words in an instrument, or in several instruments, actually before the witness and the jury, does not necessarily imply any opinion as to handwriting, and certainly does not require a previous acquaintance with the handwriting in question. It is rather a statement by the witness of facts or impressions derived from actual inspection of a document or documents immediately before him and before the jury.  It seems, therefore, not to come within the rule requiring that the witness, who gives his opinion or belief as to handwriting, should have had a previous acquaintance with it, derived in one of the modes before stated as part of the rule.  And as the counsel, in arguing the cause before the jury, might undoubtedly call their attention to such discrepancies as he supposes to exist, whether the jury would otherwise have observed them or not, so we think a witness who is experienced in such matters may, whether previously acquainted with the particular handwriting or not, state the discrepancies which he observes in the writing—the jury being, in either case, the ultimate judges as to the existence of the discrepancies, and as to their effect upon the question of handwriting.

The case as to the admissibility of so much of this testimony as related to the evidences, on the face of the paper, of erasure and insertion of other words in the place of those originally written, is even stronger than that just disposed of, since it is still further from implying any opinion as to handwriting, and relates to matters of which persons accustomed to writing, and presumably to erasures and insertions, and to the consequent appearance of the paper and the writing on it, must be supposed to have peculiar knowledge.  For this reason, in addition to what has

2. Upon the question whether certain alterations in a will, the body of which was admitted to be in the handwriting of the testator, were also in his handwriting it was competent for witnesses, tho' not acquainted with the handwriting of the

testator, to give their opinions whether the alterations were or were not in the handwriting of the balance of the will, and to point out variances in the form of letters, words, &c., leaving the jury to decide upon their own inspection as well as such aids. (1 *Greenleaf,* §577.)

already been said in reference to the discrepancies in the formation of letters, &c., we are of opinion that so much of this testimony as points out the differences, apparent in the judgment of the witnesses on the face of the writing, between certain letters and words in the disputed parts, and the same letters and words in other parts of the instrument, and so much as states the evidences of erasure and insertion of words and figures, and the opinion of the witnesses that there has been an erasure and insertion in certain parts of it, was properly admitted, subject, as already said, to be weighed by the jury with the other evidence before them, including their own inspection of the instrument, and to have such influence as they, in their discretion, may think due to it. Having decided that this testimony is admissible, we deem it but just to remark, that if erasures were made in the instrument by C. S. Hawkins himself, and other words or figures written by him upon the erasures, the space thus made for the new words might induce a writing more open or more constrained and closer than usual, and perhaps differing in other respects from the residue of the instrument, or from his ordinary writing.

3. Witnesses not acquainted with the handwriting of the party, cannot, where the writing appears to have been altered by erasures and interlineations, testify and give their opinion whether the whole or any part is genuine; in such case, opinion must be founded upon previous knowledge of the handwriting of the party.

The question as to the other branch of the testimony objected to is essentially different from that which has been just considered. The testimony now in question is not the statement of facts derived from mere inspection, or touch, and subject to be tested by the senses of the jury or of other witnesses, but is the statement of opinions as to handwriting, derived not from that previous knowledge or impression which, according to the general rule on the subject, a witness must have in order to qualify him to express his opinion or belief as to handwriting, but from the immediate comparison of different portions of an instrument with the handwriting of which he has no previous acquaintance. The witness does not compare the writing before him with any exemplar formed in his mind naturally, incidentally, and without

design or bias. But his attention is first called to different instruments, or to different parts of the same instrument, for the purpose of proving or disproving the identity of the handwriting, by saying, in effect, that if one instrument or one part of the same instrument is in the handwriting of the person in question, the other in his opinion and belief is not. If it is not certain that persons thus called to the comparison, will always form their opinions under a bias of which they may be unconscious, in favor of the conclusion which they are expected to support, there is ground for apprehending that such, to a greater or less extent, will often and indeed generally be the case; while the fact that the witnesses are men of character and skill may give undue weight to their opinions, and thus add to the danger of admitting such testimony. Persons of experience and skill, though previously unacquainted with the handwriting in question, may be safely allowed to depose as to appearances perceived by them upon the paper and as to their ordinary causes, or as to the resemblance or difference in the formation and appearance of different letters or words, or even in the general appearance of different portions of the writing. But these circumstances are but elements to be considered with others in coming to a conclusion upon the general question of identity or non-identity. And as they will operate differently upon different minds, bringing them to different conclusions according to the existing bias or pre-disposition, or according to the difference of organization or of mental power of the different individuals, there is as much, or nearly as much danger of unfairness to be apprehended from the selection of the witnesses who are to give their opinions from mere comparison of writings, or parts of a writing, in juxtaposition, as in other cases, from the selection of the writings themselves, which are to be compared with that which is in dispute.

It is true Mr. Greenleaf, in the passage already quoted, intimates that in cases coming within the se-

cond exception to the general rule on this subject, the jury may, have the aid of experts in making the comparison between the different instruments properly before them. We suppose he means that experts may, upon a mere comparison, state their opinion that the instruments are or are not written by the same person, or in the same handwriting. And we admit that the present case is as strong as any can be for the admission of such testimony. But upon examination of such of the cases referred to by him as we have had access to, we do not find any adjudication which carries the exception to the general rule to that extent, in reference to instruments of such recent date as to admit of proof by living witnesses. In the present case there were, in fact, several witnesses before the jury who had such previous knowledge of the handwriting of C. S. Hawkins as authorized them to state their belief or opinion on the subject with reference to the entire instrument, and to its different parts. The jury had undoubtedly the right not only to weigh these opinions, so far as they differed, but to bring them to the test of their *own* comparison of different parts of the instrument; in making which, they might receive the aid of experts in pointing out that which they themselves perceived by their senses or even with the aid of optical glasses. But, according to our view of the principles involved, mere experts, having no previous knowledge of the handwriting in question, are not competent to state as evidence their opinions or belief on the general question of the identity or genuineness of the handwriting of different parts of the instrument: first, because they have not acquired the means of forming such opinion or belief in the manner required by the rule; second, because the case presents no necessity for a departure from the rule; and third, because the impressions from which they would speak are probably formed for or by the occasion and under the bias of a *lis mota*, and are at any rate without that guarantee of fairness and impartiality which the rule intends to es-

tablish, and which, though it often admits very weak testimony of handwriting, it is calculated generally to secure. The admission of mere opinion as evidence is itself an exception to the broad rule which requires a witness to speak only of what he knows. In the case of handwriting, and perhaps in all other cases of exception, the rule defining the exception requires that the opinion, to be admitted as evidence, must be founded on previous knowledge. And we think the only established or allowable ground of departure from this requisition is that of necessity.

The cases referred to in the argument of this question, and most of the others which we have seen, relate to the admissibility of other writings introduced for the mere purpose of comparison with that in question, as a means of determining its genuineness. And although there is considerable diversity of opinion with regard to their admissibility for the purpose of comparison even by the jury, the current of authority and the decisions of this court are against it. (See *McAllister* v. *McAllister*, 7 *B. Monroe*.) The case of *Doe ex dem. Mudd* v. *Suckermore*, 5 *Adol. & Ellis*, 703, decided in 1836, in which the judges of the King's Bench were equally divided, and gave their opinions *seriatim*, and at great length, presents the question as to the competency of a witness, offered merely as an expert, to prove the non-identity of the handwriting of a signature before the jury, with others admitted to be genuine by the person whose signature was in question, and who, being himself a witness, stated that the disputed signature (as an attesting witness to a will,) was his. The other signatures which had been shown to him on the first day of the trial, and admitted by him on oath before the jury, were on that evening submitted to an expert for the purpose of studying them and of thus making himself familiar with the handwriting. And on the next day he was offered to prove that the signature in question was not the same, or was not genuine. This testimony was rejected at *nisi prius*, and by a division of the court in

HAWKINS
*vs.*
GRIMES.

4. The decisions of this court are against comparison of handwriting, even by the jury, to determine their genuineness. (See *McAllister* v. *McAllister*, 7 *B. Monroe*; see, also, 5 *Adol. & Ellis*, 703, decided in 1836 in which the English judges were equally divided.)

bank, stood rejected. The question in this case is not precisely the same, because here the comparison is confined to different parts of a single instrument necessarily before the jury. But the discussion of the judges, in the case referred to, goes greatly beyond the objection to the introduction of irrelevant writings for the mere purpose of comparison, and presents with great ability on each side the principles and authorities applicable to the proof of handwriting. And it is with a view to this discussion that we refer to the case, as tending to corroborate our own conclusion, that the testimony now in question was erroneously admitted.

Upon the whole evidence in the case, the court overruling the instructions asked for by the complainants, gave in lieu thereof a comprehensive instruction as follows, viz : "That if the jury found from the evidence, that the paper set up as the will of Charles S. Hawkins was entirely in his handwriting, and that at the time of writing it he had mind and memory sufficient to make a rational disposition of his estate, they ought to find it to be his will ; but unless they so found, they ought to find it not to be his will ; and that it devolved upon the defendant to prove that the will was wholly in the handwrite of C. S. Hawkins, and that at its publication he was of competent mind and memory to make it."

To so much of this instruction as directs what the verdict should be, in case the jury should, upon the evidence before them, that is, upon the whole evidence, believe that the proposed will was or was not entirely in the handwriting of C. S. Hawkins, and that at the time of writing it he was or was not of disposing mind and memory, there is no serious objection. For although the precise legal question is not as to the mere handwriting of the instrument, but whether it was wholly written and signed by the supposed testator, yet as the evidence of handwriting was the only means of proof upon this question, there could have been no misapprehension either of law or

**5. The propounder of a will holds the affirmative in the probate thereof, and must make out a *prima facie* case; when this is done, the rebutting and countervailing proof devolves upon the other party, and the jury decide upon the validity of the will from the whole proof.**

fact arising from the language used on this subject. Nor is there any question as to the effect which the belief of the jury as to the competency or incompetency of C. S. Hawkins, at the time of writing the instrument, if entirely written and signed by him, should have upon the verdict. But when the evidence on both sides was before the jury, it was their right and duty to found their conclusions as to the question in issue upon all the evidence and circumstances; and we do not perceive the propriety of instructing them as to the burthen of proof. The defendant, it is true, being the propounder of the will, held the affirmative of all the propositions essential under the statute to the validity of the alleged will. And if upon *his* own evidence he had failed to make out a *prima facie* case, on any one of these points, the jury might have been instructed to find against the will. But after making such proof, the burthen of rebutting and countervailing it devolved upon the other party. And if, upon the whole evidence, the jury can form a satisfactory belief one way or the other, it is immaterial upon whom the burthen of proof originally devolved, or by whom, or at what period of the trial, the proof which authorizes their conclusion may, in fact, have been adduced. When the instruction was given, the important question was, whether the two facts essential to the validity of the will were satisfactorily established by the evidence; and the formal instruction, that it devolved upon the defendant to prove them, was calculated to confuse and mislead the jury by giving importance to a matter which at that stage of the trial was immaterial.

This objection is applied especially to so much of the latter part of the instruction as relates to the competency of C. S. Hawkins; with respect to which it is contended that it was not only calculated to mislead, but was actually erroneous as a legal proposition, in disregarding the established presumption in favor of sanity. We do not, however, admit that this presumption dispenses with *prima facie* evidence of

sanity in making proof of a will in the court of probate. It is the common course in the county court, which is the ordinary court of probate, and the statute seems to require, that the witnesses should be interrogated on this subject, in proving the will. And it would seem that some testimony on the subject is certainly requisite in support of the will, when it is contested in chancery on the express ground of mental incompetency. But the writing or dictating of a rational will is sometimes held to be sufficient evidence of sanity, at least *prima facie.* And if upon the whole evidence, *pro* and *con,* it be doubtful whether the party be sane or not, then the presumption in favor of sanity may operate to decide the question otherwise in equipoise.

This doctrine of a presumption in favor of sanity is too well established to require a citation of authority. We refer, however, to the case of *Brooks, &c.* v. *Barrett, &c.,* 7 *Pickering's Rep.* 94, as an instance of its application to the question of probate in the manner above suggested. In that case the court, after stating that under the statute of Massachusetts the subscribing witnesses are to prove, in the court of probate, not only the execution of the will but also the sanity of the testator, and that upon appeal the same course is pursued, and that upon such proof being made the burthen shifts from the propounder to the opposer of the will, adds, that if the evidence of the proposer, that is, of the subscribing witnesses, is deficient, he is to make out the affirmative from the whole case; that if he makes out his case by the statute evidence, he has only to defend against the opposing evidence of insanity; and that having produced the statute evidence, if the case be made doubtful by the evidence on the other side, the presumption of law must have its effect upon the final decision. That clause of the instruction now under consideration seems to be erroneous in excluding altogether this presumption; and, also, in excluding the right of the defendant to make out his case on

6. The legal presumption is in favor of the sanity of a testator, though the statute may require some proof of sanity; and if the evidence render the question of sanity doubtful, the legal presumption should have its effect, and any instruction of the court which excludes that from the consideration of the jury, is erroneous.

the question of sanity from the whole case before the jury. If upon the whole case, they should doubt upon the question of sanity, the instruction seems to indicate that the verdict should, on that ground, be against the will, because sanity was not proved by the party who was bound to prove it. Whereas, in such a case, as in a trial for homicide, the presumption of law should resolve the doubt. With respect to the identity of handwriting in different parts of the instrument, there is no presumption of law. And unless the jury were reasonably satisfied from the evidence that it was wholly written and signed by C. S Hawkins, their verdict should have been against it. But the question was to be determined upon the whole case.

As the case must go back for a new trial, and as the jury may find that the whole instrument as it now appears, including the signature and apparent alterations, was written by C. S. Hawkins, and that at the date of the original instrument he was competent to make a will, the question will arise whether, when he wrote the new words and figures and thus finished the instrument as it now appears, he was of sound and disposing mind and memory. Upon this question we remark, that if it be proved that C. S. Hawkins was sane at the date of the instrument, the continuance of this state of mind would be presumed until the contrary should be shown, and that in the absence of all evidence of insanity, his competency at the date of the alterations, though made after the date of the instrument, would be sufficiently established. It is apparent, therefore, that upon the hypothesis assumed, the propounder of the will might make out his case *prima facie* without precise proof of the time when the alterations were made, or the new words and figures written. And if he did so, the burthen of proving insanity would devolve on the other party, not requiring that he, any more than the propounder of the will, should fix the precise time of inserting the new words, but that he should produce

such evidence as would render it probable that there was insanity when they were inserted; which probability might be rebutted or disproved by evidence on the other side. The evidence on both sides might be either direct or circumstantial, and derived from every circumstance and consideration which could furnish a rational inference upon the question in issue. It would be the province of the jury to decide the question upon the whole case before them. And if upon the whole testimony it were doubtful whether, at the time of making the alterations, C. S. Hawkins was competent to make a will, we do not see why that doubt should not be resolved by the presumption of law in favor of sanity, just as it would be with respect to the entire instrument if there had been no alteration apparent on its face, and if, after general or *prima facie* evidence of sanity, the question was made doubtful by opposing evidence. If the instrument were wholly written and signed by C. S. Hawkins, and was free from appearance of alteration and had no date, and if upon the question of probate it appeared that he had been sane until within eighteen months before his death, when he became and continued insane, it would not devolve upon the propounder of the will, though holding the affirmative upon the question of sanity, to prove precisely and beyond a doubt that it was written and signed before the period when the insanity commenced. The instrument itself might contain sufficient evidence that it was written by a sane man, or the contrary. And if upon this and other evidence the question were still in equipoise, it seems to us that the presumption of law should prevail. We have abstained from any intimation of opinion as to such facts as seem to be seriously contested.

For the errors above noticed the decree is reversed, and the cause remanded for a new trial, in conformity with the principles of this opinion.

*Turner* and *Caperton*, for appellant; *Harlan* and *Burnam*, for appellee.